IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INNOVATIVE V, LLC d/b/a TPH ACADEMY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:25-cv-01055-UNA |
| v. | ) | |
| | ) | |
| THE ST. JAMES SPORTS & WELLNESS COMPLEX LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Innovative V, L.L.C. d/b/a TPH Academy ("TPH" or "Plaintiff") hereby submits this Complaint against Defendant The St. James Sports & Wellness Complex LLC ("STJ" or "Defendant") as follows:

## NATURE OF THE ACTION

1.      TPH is an elite development group that works with middle school, high school, and post graduate student-athletes to help them achieve their goals in a wide variety of sports.  TPH launched the "TPH Academy" in 2014 for student-athletes who want to replace the traditional school experience with academics, training, and play.  TPH operates and supports numerous multi-sport academies.

2.      In addition to operating its own academies, TPH offers academy services to multi-sport facilities, youth sports organizations, and families that are involved in youth sports.

3.      TPH is the industry leader in the daytime, multi-sport, academy model. TPH has provided its TPH Academy services for over a decade and has supported thousands of families who have trusted TPH to support their children with high quality athletics and academics.

4.      In 2019, TPH approached STJ about launching an academy for the hundreds of middle and high school student-athletes who train at its 20-acre 450,000-square-foot multi-purpose

sports complex in Springfield, Virginia. While TPH and STJ continued to have discussions over the years, nothing materialized until 2024.

5.      On or about 2024, TPH proposed the "Powered by TPH" option for the STJ youth sports academy. STJ had no experience setting up or operating an academy, but with TPH's expertise, know-how, and experience running the proposed academy STJ could still own it. Accordingly, STJ entered into an agreement with TPH in March 2024 in which TPH would set up and run the academy in partnership with STJ for three years.

6.      Despite STJ's reliance on TPH to start the academy, STJ only wanted TPH long enough for it to learn how to run the youth sports academy, so that it could then take all of the earnings for itself.  Because STJ wanted to cut TPH out as quickly as possible, STJ proposed a contract provision that would have allowed it to simply terminate its agreement with TPH upon 120 days' notice.  TPH balked at that unfair provision and insisted that any agreement between the parties be a minimum of three years due to the time and resources that TPH would be required to invest in launching and operating the academy.  And that is exactly what STJ agreed to in the parties' March 2024 agreement.

7.      Unfortunately, STJ, a large and well-funded company, did not honor the parties' agreement.  STJ terminated the parties' agreement in July 2025 – a little over a year after the parties entered the agreement and just long enough for TPH to position the academy for tremendous financial success in year two of the agreement.

8.      To collect all the academy's earnings, STJ cut TPH out under the pretext that TPH committed a "material breach."  TPH did not breach the contract, let alone commit a "material breach."  To the contrary, TPH exceeded STJ's recruitment goals in year one and blew STJ's year two recruitment goals out of the water by exceeding over 200 student-athletes for the 2025-2026

school year.  In support of its fake material breach claim, STJ made-up issues that it had never raised with TPH and, in any event, are completely contradicted by the parties' conduct.  STJ's breach of the Services Agreement cost TPH millions of dollars in lost earnings from the continued success of the STJ academy (Powered by TPH).

9.      Emboldened by its breach and perhaps believing that TPH – a small business that does not have billions of dollars in its pockets – would do nothing about it, STJ operated the academy for the 2025-2026 school year (year two of the contract) without TPH by employing TPH's most important employee (Dr. Tere Hernandez-Acosta – who resigned from TPH on or about the first day of school), partnering with TPH's school solution (Stride/K12), and using TPH's best practices.  While TPH removed TPH from its website, Dr. Tere Hernandez-Acosta and K12 are featured prominently on STJ's "academy" webpage.

10.     STJ's breach of contract and tortious interference with TPH's contracts with Dr. Hernandez-Acosta and Stride/K12 – whom STJ induced and persuaded to terminate their contracts with TPH – caused TPH millions of dollars in damages.

11.     By this action, TPH seeks to recover the damages that STJ's breach of contract and tortious interference caused TPH to suffer.

## PARTIES AND JURISDICTION

12.     TPH is an Alabama limited liability company.

13.     STJ is a Delaware limited liability company.

14.     This Court has personal jurisdiction over STJ because STJ is a Delaware limited liability company.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, based on the diversity of citizenship between the parties and the amount in controversy being in excess of $75,000, exclusive of interest and costs.

## FACTUAL ALLEGATIONS

**A.      STJ and TPH Preliminarily Discuss the Creation of a Sports Academy at STJ**

16.      The first meeting between TPH and STJ occurred in March of 2019.  TPH's founder and chief operating officer at the time met with STJ's co-founder and co-CEO.  TPH introduced the concept of a youth sports academy at STJ's sports complex, and the parties discussed, among other things, STJ's massive multi-sports facility and operations and TPH's interest in starting a daytime academy for student-athletes at STJ's facility.

17.      The next meeting between the parties occurred on December 15, 2022, at which TPH's CEO met with both of STJ's co-founders at STJ's Virginia facility.  TPH again expressed interest in potentially partnering with STJ to start up and operate an academy for student-athletes at STJ's multi-sport complex.

18.      After more meetings between the parties and the exchange of multiple draft memoranda of understanding, the parties met virtually on January 23, 2024 to discuss a draft services agreement.  It was clear that STJ did not want TPH as a long-term partner. For example, STJ reduced both the proposed term of the agreement and the automatic renewal term from five to three years. STJ also wanted to use its own registration and payment platform for the academy, which TPH rejected because TPH was responsible for recruitment and needed to know how recruiting was going at all times.  Moreover, STJ added a 120-day notice of termination clause "for any reason" to the draft Services Agreement so that it could terminate the agreement prior before three years. TPH also rejected that unfair addition.

19.      Although TPH suspected that STJ only wanted to engage TPH to start a youth sports academy and learn what it could about operating an academy from the industry-leading company before cutting it out, TPH told STJ in no uncertain terms that unless it had at least a 3-

year commitment from STJ, the time and resources that it would be required to invest did not make financial sense for TPH.

20.     STJ ultimately committed to a three-year contract with TPH, including an automatic renewal.  Accordingly, TPH executed the Services Agreement.

**B.      TPH and STJ Execute a Services Agreement in March 2024**

21.     TPH and STJ entered into the Services Agreement on March 18, 2024.  A true and correct copy of the Services Agreement is attached hereto as Exhibit 1.  The initial term of the Services Agreement was for a little more than three years from the effective date, until July 1, 2027, with an automatic renewal of three years at the end of the term.  Ex. 1 at § 2(a).

22.     Under the Services Agreement, STJ engaged TPH to provide various services to STJ for its sports academy as part of its "Powered by TPH Academy" service, including, but not limited to, the various services listed on Exhibit A to the Services Agreement.

23.     Among other things, the Services Agreement required TPH to provide directorship and leadership to the academy, accredited online platforms for both middle and high school students, and a Head of Academics and Success Coaches to hold the student-athletes accountable for academic success and to customize the learning experience for each student-athlete.  Ex. 1 at Ex. A.

24.     The Services Agreement provided that STJ "shall pay TPH the fees set forth on Exhibit A attached hereto."  Ex. 1 at § 3(a).  Those included, among other things, a variable amount on a "per student-athlete" basis, from $3,499 to $4,499.  *Id.*, Ex. A at 5–6.

25.     STJ also agreed to pay TPH a pass-through amount for the Director position for the academy and the Head of Academics.  *Id.*, Ex. A at 5.

26.     The Services Agreement contained a non-solicitation provision:

> Company agrees during the Term of this Agreement and for a period of two (2) years immediately thereafter, it shall not directly, or indirectly, for itself, or as an agent or representative of any person or for any business entity, except as set forth in this Section 9: (a) advise, induce or persuade any person or business not to do business with TPH or to cancel or fail to renew any contract with TPH; (b) employ, retain, contract with or interfere with any employees or independent contractors of TPH with respect to the work performed by such employees and independent contractors for, or on behalf of, TPH; (c) solicit, induce, persuade, or advise any employees or independent contractors of TPH to terminate any relationship with TPH; or (d) obtain any type of financial interest in any business entity which engages in any of the foregoing.

*Id.* § 9.

27.    The non-solicitation provision, Section 9, as well as Sections 3, 5, 7, 8, and 10, "survive the termination of" the Services Agreement.  Ex. 1 at § 10(a).

28.    Conspicuously absent from the final Services Agreement was the 120-day termination-for-convenience provision that STJ originally suggested, or anything like it.

**C.    TPH Satisfies Its Obligations Under the Services Agreement**

29.    As part of its responsibilities under the Services Agreement, TPH was required to "hire a Director to lead the academy as TPH's onsite Director[.]"  Ex. 1, Ex. A at 2.

30.    TPH hired Dr. Tere Hernandez-Acosta as the Director of Academics for the academy, and as part of that hiring, entered into a Confidentiality, Non-Competition and Non-Solicitation Agreement with her.  That agreement is attached hereto as Exhibit 2.

31.    Because Dr. Hernandez-Acosta had already worked with TPH for approximately three years at an academy located in Florida, she brought a depth of experience and knowledge to the STJ academy from day one – a major benefit for the academy.

32.    Dr. Hernandez-Acosta agreed to not compete with TPH during the term of her employment by TPH and "for a period of one (1) year immediately thereafter[.]" *Id.* § 2.

33.    Specifically, Dr. Hernandez-Acosta agreed to not:

directly or indirectly, for [her]self or through, on behalf of or in conjunction with, any person, persons, partnership, corporation, limited liability company or other business entity, carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business within fifty (50) mile radius of any location from which TPH operates its business and/or provides its products and services, without the express written consent of TPH. For purposes of this Agreement, "Competitive Business" means any person, firm, entity, partnership, limited liability company, corporation or other organization which engages in providing the same or similar hockey products and services provided by TPH.

*Id.*

34.    In addition to hiring Dr. Hernandez-Acosta, TPH installed a thorough management cadence throughout the school year with STJ for the 2024-2025 school year to ensure the quality of TPH's delivery of services. STJ never indicated a lack of satisfaction with TPH during year one of the agreement. Nor did STJ's co-CEOs even bother to reply to two September 2024 emails from TPH's CEO trying to establish a quarterly partnership cadence.

35.    Indeed, family satisfaction from the student-athletes at the STJ academy (Powered by TPH) was strong – as shown on the surveys that TPH conducted.

**D.    TPH Partners with Stride/K12 for the Academy's School Solution, Clearing the Recruitment Hurdle the Academy Faced**

36.    TPH met its recruitment goals for the first year of the Services Agreement with STJ.

37.    From the outset of the Services Agreement, TPH retained the services of Stride, Inc. (the parent for K12, referred to herein as "Stride/K12") – a leader in online education – for the versatility of its private and public-school offerings. One such Stride/K12 public solution was Virtual Academy ("VAVA"), which was offered to STJ student-athletes in addition to Stride/K12 private school platforms.

38.     In the second year of the agreement, TPH and K12 Virtual Schools LLC ("K12") entered into a second Memorandum of Understanding on February 27, 2025 (the "MOU"), which covered the 2025-2026 academic school year.  A true and correct copy of the MOU, as well as the 2024 MOU, are attached hereto as Exhibits 3 and 4.

39.     Seeking a path to launch academy teams that could compete for state championships, STJ asked TPH to find a school solution to qualify the teams for recognized state competitions.  TPH contacted the Virginia Council for Private Education ("VCPE") to discuss options and solutions for the student-athletes at the academy to compete for state championships in a scholastic league.  Subsequently, TPH coordinated with and sourced Stride/K12's The Keystone School (a Virgina-based partner of Stride/K12) as a solution for allowing STJ's academy student-athletes to compete for Virginia state championships.

40.     TPH's partnership with Stride/K12 and The Keystone School opened the recruiting floodgates at STJ's academy (Powered by TPH).  In year two of the agreement academy recruitment was trending toward more than 200 student-athletes, approximately seven-to-nine times growth over year one – and far exceeding STJ's student-athlete enrollment goals for TPH.

**E.     TPH Has Discussions with a Maryland-Based Soccer Club About Opening an Academy**

41.     On or around August 2024, TPH began discussions with a Maryland-based youth soccer club about starting a soccer academy.  Nothing in the Services Agreement prohibited TPH from talking or working with other youth sports organizations.

42.     Upon information and belief, STJ was upset by a TPH serviced academy at the Maryland-based youth soccer club.  On January 7, 2025, one of STJ's co-CEOs emailed TPH's CEO noting that he had heard that TPH was launching an academy in Maryland and expressed his concerns with the launch of that academy.

8

43.     STJ's co-CEO stated in a meeting the following day that STJ would need to determine how to proceed with its academy.

44.     On March 25, 2025, TPH's now Chief Academics Officer met with the co-founders and co-CEOs of STJ, various STJ employees, and TPH employee Dr. Hernandez-Acosta.

45.     During the meeting, one of STJ's co-CEOs discussed a proposal from Stride/K12 regarding a custom virtual private school solution developed at the request of STJ.

46.     Among other things, the proposal included VCPE-approval, which is the same approval that TPH worked with Stride/K12 to secure.

47.     In response to the presentation of the proposal, TPH's Chief Academics Officer asked where TPH Academy fit into the plan.

48.     One of STJ's co-CEOs responded, "Well, you don't."

49.     That same co-CEO further confirmed that the proposal was for the 2025-2026 school year.

50.     TPH's Chief Academic Officer inquired about how STJ would operate the academy without TPH, and STJ indicated that they had "Dr. Tere," meaning Dr. Hernandez-Acosta.

51.     When TPH's Chief Academics Officer expressed his displeasure with STJ's plan, one of STJ's co-CEOs stated that STJ was "not done" working with him (TPH's Chief Academics Officer), and that they "had his [telephone] number" and saw "a big contract" for him.

52.     TPH's Chief Academic Officer asked what he should tell TPH's leadership, to which STJ's co-CEO stated: "Tell [TPH's CEO] he should have never signed Bethesda," the Maryland-based soccer club.

F.     **STJ Wrongfully Terminates the Services Agreement**

53.     After the end of the 2024-2025 academy year, and prior to the start of the new 2025-2026 academic school year, one of STJ's co-CEOs requested to speak with TPH's CEO.  The two

9

spoke via phone on June 27, 2025, and during that call STJ's co-CEO expressed STJ's "disappointment" in the services provided by TPH and stated that it did not make sense for STJ to continue working with TPH.

54.    Shortly after STJ's co-CEO spoke with TPH's CEO on June 27, 2025, STJ sent a notice letter to TPH pursuant to Section 2(d) of the Services Agreement alleging that TPH had "failed to fulfill multiple obligations outlined in Exhibit A" of the Services Agreement.

55.    Section 2(d) of the Services Agreement states that "[e]ither Party may terminate this Agreement in the event the other Party materially breaches any of its obligations under any provision of this Agreement, and such breach is not remedied within fifteen (15) days after the receipt of written notice thereof by the other Party."  Ex. 1 at § 2(d).

56.    At no point between the signing of the Services Agreement on March 18, 2024 and STJ's June 27, 2025 letter did STJ or any of its employees, personnel, contractors, or agents ever raise any issues with TPH's performance under the Services Agreement.

57.    Upon information and belief, STJ's supposed "disappointment" with TPH's performance under the Services Agreement was pretext for STJ's displeasure with TPH working with the Maryland-based youth soccer club.  And STJ's wrongful termination of the Services Contract was in furtherance of its desire to terminate TPH as soon as TPH set up the academy and STJ felt that it had learned enough from TPH to operate the academy on its own.  Neither STJ's "disappointment" nor its termination of the Services Agreement was for any deficient performance by TPH under the parties' agreement.

58.    On July 11, 2025, TPH responded to the STJ's June 27 letter, refuting STJ's allegations of breach and stating that not only had TPH "upheld and delivered on the services

agreement with STJ, but also gone above and beyond for STJ and the partnership between STJ and TPH."

59.     TPH's response letter further explained that TPH had met the first-year goal of student-athlete enrollment and, at the time of the letter, year two blew STJ's recruitment goal out of the water and exceeded 150 student-athletes. In fact, academy recruitment was trending even higher and was on pace toward recruiting more than 200 student-athletes.

60.     On July 23, 2025, STJ sent a letter purporting to terminate the Services Agreement. The letter stated:  "We expect TPH to fully cooperate in providing The St. James Performance Academy with all data and information related to services provided by TPH since March 2024, including but not limited to information related to all prospective and enrolled students, by the close of business on July 30, 2025."

61.     On July 30, 2025, TPH responded to the termination letter, acknowledging its understanding that "The St. James no longer wants TPH to perform under this contract.  As such, in an effort to mitigate damages incurred by TPH and provide a smooth transition for the student-athletes and their families, we will cease to deliver services as of July 30, 2025, the date of this letter."

62.     TPH included in its responsive letter the data that STJ requested about the student-athletes from TPH's registration and customer relationship management software.

63.     STJ employees were apparently unaware of the termination and TPH's severance of services at STJ's insistence.  For example, on July 31, 2025, STJ's Manager of Sports Registration, Procurement & Logistics for STJ emailed TPH employees, stating: "Look [sic] like I no longer have access to the TPH LeagueApps site.  Can I regain access?"

**G.    STJ Improperly Solicits Strike/K12 and Tortiously Interferes with TPH's Agreement with Stride/K12**

64.    After STJ improperly terminated the Services Agreement, TPH was contacted by the Vice President of K12 School Development, stating that it was K12's "understanding that TPH will not be working at the St. James Academy location in Virginia, where our VAVA students will be attending during the 2025-2026 school year."

65.    Prior to the email from the Vice President of K12 School Development to TPH, the Vice President of K12 School Development texted TPH's Chief Academic Officer, notifying him that STJ had requested a proposal from K12, without TPH.

66.    The Vice President of K12 School Development stated the MOU signed in February of 2025 "is no longer needed" and attached a draft termination agreement.

67.    STJ's website still lists K12 and VAVA as its school providers, which TPH engaged and established at the academy.  A printout of the website is attached hereto as Exhibit 5.

68.    Upon information and belief, STJ knew that TPH had contracted with K12 to provide academic services for the academy and thus knew of the agreement between TPH and K12.

**H.    STJ Improperly Solicits Dr. Hernandez-Acosta and Tortiously Interferes with TPH's Contract with Her**

69.    On or about August 8, 2025, TPH learned that Dr. Hernandez-Acosta was asked by STJ to continue on in her role as Director of the STJ academy.

70.    Upon information and belief, Dr. Hernandez-Acosta signed a contract with STJ around that same date. She is listed as part of the "Leadership Team" and as the Chief Academic Officer at the STJ academy.

71.    On or around the first day of school at the STJ academy, Dr. Hernandez-Acosta resigned from TPH.

72.     Upon information and belief, STJ solicited Dr. Hernandez-Acosta for several months prior to her resignation from TPH and repeatedly assured her that she would have a job with STJ after it terminated TPH.  And, upon information and belief, Dr. Hernandez-Acosta was working for STJ, including attending new student orientation during the week of August 11-15, 2025, prior to her resignation from TPH.

73.     Upon information and belief, STJ knew of the contract between Dr. Hernandez-Acosta and TPH, including about her non-compete obligation.

74.     With TPH's best practices, TPH's most important employee at the STJ academy, and TPH's school partner, Stride/K12, STJ cut TPH out of the academy that it organized at STJ's facility to begin the 2025-2026 school year.

**COUNT I**
**BREACH OF CONTRACT**
**(Section 2(d))**

75.     TPH incorporates and realleges paragraphs 1–74 as though fully alleged and set forth herein.

76.     The Services Agreement is a valid, binding, and legally enforceable written agreement between the parties.

77.     At all relevant times, TPH materially complied with the terms of the Services Agreement and otherwise performed in accordance with the Services Agreement.

78.     STJ breached the Services Agreement by improperly terminating it under Section 2(d) of the Services Agreement, under the pretext that it was "for cause."

79.     Given TPH's compliance and performance under the Services Agreement, STJ had no basis to terminate the Services Agreement under Section 2(d) of the Services Agreement, which TPH fully explained in its July 11, 2025 letter to STJ.

80.     STJ terminated the Services Agreement because it wanted the earnings from the academy all for itself.  STJ only needed TPH to start an academy, which TPH did in year one of the agreement.  After STJ learned TPH's best practices, at the beginning of the 2025-2026 academic year it took TPH's Director of Academics, it took TPH's partner Stride/K12, and it cast TPH aside, thereby cutting TPH off from fruits of its labor and the earnings that it was rightfully owed in years two and three of the agreement.

81.     TPH's agreement with the Maryland-based soccer club about opening an academy, which TPH was allowed to do under the Services Agreement, apparently hit a nerve.  After that agreement, STJ abruptly terminated the Services Agreement by trumping up a bunch of false claims of TPH's "material breach" as an excuse for its own breach.  While TPH's July 11, 2025 letter explained STJ's breach and put STJ on notice of its breach, STJ never responded.

82.     The timing of STJ's termination of the Services Agreement was intentional.  Upon information, it came after TPH and Stride/K12 devised a solution to allow student-athletes the STJ academy to compete for state championships in Virginia – thus clearing a major recruiting obstacle at the academy.  With that impediment removed, TPH had enrolled more than 150 student-athletes at the academy and was on pace for more than 200 enrolled students for the 2025-2026 school year, a number that exceeded all goals and expectations and positioned TPH to earn millions of dollars over the next two years.

83.     STJ's breach of Section 2(d) of the Services Agreement, by improperly terminating it, caused TPH economic harm and damages, including the fees due to TPH under Section 3(a) of the Services Agreement, in an amount to be determined at trial.

84.     STJ's breach of Section 2(d) of the Services Agreement has also caused TPH reputational damages.

85.     Additionally, STJ breach of Section 2(d) of the Services Agreement caused TPH to incur attorneys' fees and costs in connection with the investigation into STJ's breach and the filing of this lawsuit.  TPH is entitled to recover its attorneys' fees and costs pursuant to Section 10(e) of the Services Agreement.

**COUNT II**
**<u>BREACH OF CONTRACT</u>**
**(Section 9 – Stride/K12)**

86.     TPH incorporates and realleges paragraphs 1–85 as though fully alleged and set forth herein.

87.     The Services Agreement is a valid, binding, and legally enforceable written agreement between the parties.

88.     At all relevant times, TPH materially complied with the terms of the Services Agreement and otherwise performed in accordance with the Services Agreement.

89.     Section 9 of the Services Agreement provides that STJ may not "(a) advise, induce or persuade any person or business not to do business with TPH or to cancel or fail to renew any contract with TPH; (b) employ, retain, contract with or interfere with any employees or independent contractors of TPH with respect to the work performed by such employees and independent contractors for, or on behalf of, TPH; (c) solicit, induce, persuade, or advise any employees or independent contractors of TPH to terminate any relationship with TPH; or (d) obtain any type of financial interest in any business entity which engages in any of the foregoing." Ex. 1 § 9.

90.     Notwithstanding Section 9 of the Services Agreement, which survives any alleged termination of the Services Agreement (*see* Ex. 1 § 10(a)), STJ knowingly and intentionally advised, induced, and persuaded Stride/K12 not to do business with TPH under its agreement with

TPH and to cancel the agreement. STJ also knowingly and intentionally retained and contracted with Stride/K12 with respect to the work performed by Stride/K12 for, or on behalf of, TPH. And STJ knowingly and intentionally solicited, induced, persuaded, and advised K12 to terminate its relationship with TPH.

91.    Accordingly, STJ breached Section 9 of the Services Agreement by: (1) advising, inducing, and persuading K12 not to do business with TPH and to cancel and fail to renew its contract with TPH; (2) retaining and contracting with K12 with respect to the work performed by K12 for, or on behalf of, TPH; and (3) soliciting, inducing, persuading, and advising K12 to terminate its relationship with TPH regarding the Services Agreement.

92.    STJ's breach of Section 9 of the Services Agreement caused TPH economic harm and damages in an amount to be determined at trial.

93.    Additionally, STJ's breach of Section 9 of Services Agreement has caused TPH to incur attorneys' fees and costs in connection with the investigation into STJ's breaches and the filing of this lawsuit. TPH is entitled to recover its attorneys' fees and costs pursuant to Section 10(e) of the Services Agreement.

## COUNT III
## BREACH OF CONTRACT
### (Section 9 – Dr. Hernandez-Acosta)

94.    TPH incorporates and realleges paragraphs 1–93 as though fully alleged and set forth herein.

95.    The Services Agreement is a valid, binding, and legally enforceable written agreement between the parties.

96.    At all relevant times, TPH materially complied with the terms of the Services Agreement and otherwise performed in accordance with the Services Agreement.

97.     Section 9 of the Services Agreement provides that STJ may not "(a) advise, induce or persuade any person or business not to do business with TPH or to cancel or fail to renew any contract with TPH; (b) employ, retain, contract with or interfere with any employees or independent contractors of TPH with respect to the work performed by such employees and independent contractors for, or on behalf of, TPH; (c) solicit, induce, persuade, or advise any employees or independent contractors of TPH to terminate any relationship with TPH; or (d) obtain any type of financial interest in any business entity which engages in any of the foregoing." Ex. 1 § 9.

98.     Notwithstanding Section 9 of the Services Agreement, which survives any alleged termination of the Services Agreement (*see* Ex. 1 § 10(a)), STJ knowingly and intentionally advised, induced, and persuaded Dr. Hernandez-Acosta not to do business with TPH and to cancel her contract with TPH. STJ also knowingly and intentionally retained and contracted with Dr. Hernandez-Acosta with respect to the work performed by K12 for, or on behalf of, TPH. And STJ knowingly and intentionally solicited, induced, persuaded, and advised Dr. Hernandez-Acosta to terminate her relationship with TPH.

99.     Accordingly, STJ breached Section 9 of the Services Agreement by: (1) advising, inducing, and persuading Dr. Hernandez-Acosta not to do business with TPH and to cancel and fail to renew her contract with TPH; (2) retaining and contracting with Dr. Hernandez-Acosta with respect to the work performed by her for, or on behalf of, TPH; and (3) soliciting, inducing, persuading, and advising Dr. Hernandez-Acosta to terminate her relationship with TPH.

100.     Dr. Hernandez-Acosta worked for TPH for three years running the TPH academy in Florida. As a seasoned professional who knew the TPH way to run an academy, TPH retained

her to work at the STJ academy (Powered by TPH).  STJ stole Dr. Hernandez-Acosta from TPH, in violation of STJ's agreement with TPH.

101.    STJ's breach of Section 9 of the Services Agreement caused TPH economic harm and damages in an amount to be determined at trial.

102.    Additionally, STJ breach of Section 9 of Services Agreement has caused TPH to incur attorneys' fees and costs in connection with the investigation into STJ's breaches and the filing of this lawsuit.  TPH is entitled to recover its attorneys' fees and costs pursuant to Section 10(e) of the Services Agreement.

**COUNT IV**
**TORTIOUS INTERFERENCE**
**(Stride/K12)**

103.    TPH incorporates and realleges paragraphs 1–102 as though fully alleged and set forth herein.

104.    The MOU between TPH and K12 is a valid, enforceable, and legally binding contract.

105.    STJ knew of the agreement between TPH and K12.

106.    Under the agreement, Stride/K12 undertook and assumed certain obligations, including working with TPH for the 2025-2026 academic school year and making payments to TPH based on the enrollment by student-athletes at the academy.

107.    STJ knowingly and intentionally caused Stride/K12 to breach the agreement by terminating it in order to work directly with STJ.

108.    STJ had no justification for seeking to work directly with Stride/K12, in violation of Stride/K12's agreement with TPH.

109.    TPH has suffered and continues to suffer significant damages as a result of STJ's unjustified interference with its agreement with K12.

110.    STJ is liable for tortious interference with the contract between TPH and K12 and TPH is entitled to money damages in an amount to be determined at trial.

## COUNT V
## TORTIOUS INTERFERENCE
### (Dr. Hernandez-Acosta)

111.    TPH incorporates and realleges paragraphs 1–110 as though fully alleged and set forth herein.

112.    The Confidentiality, Non-Competition and Non-Soliciation Agreement between TPH and Dr. Hernandez-Acosta is a valid, enforceable, and legally binding contract.

113.    STJ knew of the contract between TPH and Dr. Hernandez-Acosta, and upon information and belief knew about her non-compete obligation.

114.    Under the contract, Dr. Hernandez-Acosta undertook and assumed certain obligations, including not competing with any "Competitive Business" of TPH without the express written consent of TPH.

115.    STJ did knowingly and intentionally caused Dr. Hernandez-Acosta to breach the contract by contracting to work directly with STJ as the Director of Academics for the STJ academy.

116.    STJ had no justification for seeking to work directly with Dr. Hernandez-Acosta, in violation of Dr. Hernandez-Acosta's contract with TPH.

117.    Dr. Hernandez-Acosta worked for TPH for three years running the TPH academy in Florida.  As a seasoned professional who knew the TPH way to run an academy, TPH retained

her to work at the STJ academy (Powered by TPH).  STJ stole Dr. Hernandez-Acosta away from TPH, in violation of both her and STJ's agreements with TPH.

118.    As a result, TPH has suffered and continues to suffer significant damages as a result of STJ unjustified interference with its contract with Dr. Hernandez-Acosta.

119.    STJ is liable for tortious interference with the contract between TPH and Dr. Hernandez-Acosta and TPH is entitled to money damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, TPH respectfully prays for the following relief:

A.    Judgment in Plaintiff's favor;

B.    An award of compensatory and punitive damages resulting from Defendant's actions,

C.    An award of attorneys' fees and costs incurred in preparing, filing, and prosecuting this action,

D.    An award of costs and expenses incurred in preparing, filing, and prosecuting this action;

E.    An award of pre-judgment and post-judgment interest at the statutory rate; and

F.    Any and all additional relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 22, 2025

B AKER & H OSTETLER LLP

/s/  *Jeremy D. Anderson*
Jeremy D. Anderson (#4515)
Jeffrey J. Lyons (#6437)
1201 North Market Street, Suite 1407
Wilmington, DE 19801
(302) 407-4224
jdanderson@bakerlaw.com
jjlyons@bakerlaw.com

*Attorneys for Plaintiff*